UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
NORMA KNOPF and MICHAEL KNOPF,

                                                      Case No.15 Civ. 05090(DLC)

                          Plaintiffs,

          -against-

MEISTER SEELIG & FEIN, LLP and PURSUIT
HOLDINGS, LLC,

                          Defendants.
--------------------------------------------------------------------X

---

**DEFENDANT MEISTER SEELIG & FEIN LLP'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR AN ORDER
GRANTING SUMMARY JUDGMENT IN MSF'S FAVOR AND
DISMISSING THE SOLE CLAIM ASSERTED BY PLAINTIFFS
IN THEIR SECOND AMENDED COMPLAINT**

---

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 655-3500
*Attorneys for Defendant*
*Meister Seelig & Fein LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STAMENT OF FACTS ........................................................................................................... 5

PROCEDURAL HISTORY ..................................................................................................... 10

STANDARD OF REVIEW ..................................................................................................... 12

ARGUMENT ........................................................................................................................... 13

PURSUIT'S SECURING PAYMENT OF ITS ATTORNEY FEES BY GRANTING MSF A
MORTGAGE OF UP TO$575,000 WAS NOT A FRAUDULENT CONVEYANCE ................. 13

CONCLUSION ........................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986) ................................................................................................ 12

*Bailey v. Fish & Neave*,
　8 N.Y.3d 523, 837 N.Y.S.2d 600 (2007) ............................................................... 14

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*,
　100 A.D.3d 100, 951 N.Y.S.2d 19 (1st Dep't 2012) .............................................. 13

*Brown v. City of New York*,
　No. CV 2009–1809(RJD)(MDG), 2012 WL 628496 (E.D.N.Y. Jan. 30, 2012) ...... 14

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986) ................................................................................................ 12

*Fogelson v. Rackfay Const. Co.*,
　300 N.Y. 334, 90 N.E.2d 881 (1950) ............................................................... 15, 16

*Gala Enters., Inc. v. Hewlett Packard Co.*,
　989 F. Supp. 525 (S.D.N.Y. 1998) ........................................................................ 20

*Greenfield v. Philles Records, Inc.*,
　98 N.Y.2d 562, 780 N.E.2d 166 (2002) ................................................................. 14

*HBE Leasing Corp. v. Frank*,
　48 F.3d 623 (2d Cir. 1995) ................................................................................ 2, 15

*HBE Leasing Corp. v. Frank*,
　61 F.3d 1054 (2d Cir. 1995) ..................................................................... 17, 19, 20

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
　252 F.3d 608 (2d Cir.2001) ............................................................................. 13 n.7

*In re Successor Borrower Servs., LLC*,
　489 B.R. 336 (Bankr. W.D.N.Y. 2013) ................................................................. 21

*JA Apparel Corp. v. Abboud*,
　568 F.3d 390 (2d Cir.2009) ................................................................................... 15

*Kass v. Kass*,
　91 N.Y.2d 554, 696 N.E.2d 174 (1998) ................................................................. 15

*Knight v. U.S. Fire Ins. Co.,*
   804 F.2d 9 (2d Cir.1986) ......................................................................................... 12

*Lanier v. Bowdoin,*
   282 N.Y. 32, 24 N.E.2d 732 (1939) ....................................................................... 14

*Laskey v. Rubel Corp.,*
   303 N.Y. 69, 100 N.E.2d 140 (1951) ..................................................................... 14

*Lavespere v. Niagara Mach. & Tool Works, Inc.,*
   910 F.2d 167 (5th Cir.1990) ................................................................................... 12

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
   595 F.3d 458 (2d Cir.2010) .................................................................................... 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ............................................................................................... 12

*Moore v. Kopel,*
   237 A.D.2d 124, 653 N.Y.S.2d 927 (1st Dep't 1997) ............................................ 15

*New Avex, Inc. v. Socata Aircraft Inc.,*
   No. 02 Civ.6519 DLC, 2002 WL 1998193 (S.D.N.Y. Aug. 29, 2002) ............... 13 n.7

*Perini Corp. v. City of New York,*
   18 F. Supp. 2d 287 (S.D.N.Y. 1998) .................................................................. 14 n.7

*Quarles v. Gen. Motors Corp.,*
   758 F.2d 839 (2d Cir.1985) .................................................................................... 12

*Raskin v. Watt Co.,*
   125 F.3d 55 (2d Cir. 1997) ..................................................................................... 12

*Schron v. Troutman Sanders LLP,*
   20 N.Y.3d 430, 986 N.E.2d 430 (2013) ................................................................ 15

*Sec. Ins. Co. of Hartford v. TIG Ins. Co.,*
   360 F.3d 322 (2d Cir.2004) ................................................................................ 13 n.7

*Slamow v. Del Col,*
   79 N.Y.2d 1016, 594 N.E.2d 918 (1992) ........................................................... 13-14

*Slatt v. Slatt,*
   64 N.Y.2d 966, 488 N.Y.S.2d 645 (1985) ............................................................ 13

*Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,*
   489 U.S. 468 (1989) ............................................................................... 13 n.7

*W.W.W. Assoc. v. Giancontieri,*
   77 N.Y.2d 157, 566 N.E.2d 639 (1990) ................................................. 14

*West, Weir & Bartel, Inc. v. Mary Carter Paint Co.,*
   25 N.Y.2d 535, 255 N.E.2d 709 (1969) ................................................. 15

*Woodmere Academy v. Steinberg,*
   41 N.Y.2d 746, 363 N.E.2d 1169 (1977) ............................................... 15

**Statutes**

N.Y. Debt. & Cred. Law § 272 (McKinney) ............................................. 21

N.Y. Debt. & Cred. Law § 272(b) (McKinney) ........................................ 18

N.Y. Debt. & Cred. Law § 276 (McKinney) ............................................. 10

**Rules**

Fed. R. Civ. P. 56, *et seq.* ................................................................... 1, 12

N.Y. C.P.L.R. 5519 (McKinney) ............................................................... 9

N.Y. C.P.L.R. 6514(c) (McKinney) ................................................. 7, 17, 19

S.D.N.Y. Civ. Rule 56.1 ........................................................................... 1

Pursuant to Federal Rule of Civil Procedure 56 and this Court's Local Civil Rule 56.1, Defendant Meister Seelig & Fein LLP ("MSF") respectfully submits this Memorandum of Law in support of its motion (the "Motion") for an Order granting summary judgment in MSF's favor dismissing the sole claim asserted by Plaintiffs Norma Knopf and Michael Knopf (the "Knopfs") in their Second Amended Complaint.

## PRELIMINARY STATEMENT

MSF represented Michael Sanford and various entities he owned and controlled in a New York State court action brought by the Knopfs.  To pay for this representation, Sanford and his entities entered in to a hybrid contingent fixed and hourly fee agreement with MSF.  At the time of MSF's engagement, Sanford had no liquid assets with which to pay his legal fees, because the Knopfs had placed notices of pendency against the real properties Sanford and his entities owned. Thus, while Sanford was solvent given many millions of dollars of equity in the real properties, he could not sell, lease or refinance the properties and extract cash.

On January 6, 2015, as expressly contemplated in the written engagement agreement, Sanford, on behalf of one of his entities, Pursuit Holdings LLC, signed a promissory note in favor of MSF for "up to $575,000."  This note was given to MSF to secure payment of MSF's previously earned contingent, fixed fees, which MSF and Sanford then agreed totaled $275,000 -- and, as well, to secure specific future services  MSF and Sanford agreed (given the then posture of the case) MSF would imminently render on an hourly basis at its normal rates.[1] Sanford secured the promissory note, as expressly contemplated by the engagement agreement, by executing on behalf

---

[1] As detailed below, Sanford and MSF agreed that a *de minimus* portion of the future fees ($25,000) – attributable to one specific legal task – would be charged on a fixed fee basis.

of Pursuit a mortgage in favor of MSF against one of Pursuit's real properties in Manhattan, namely, 44 East 67 Street Penthouse C ("PHC").[2]

The $300,000 difference between the maximum principal sum evidenced by Pursuit's promissory note and the $275,000 of previously earned fees was intended to secure the specific future work required. The Knopfs contend that the $300,000 portion of the mortgage is a fraudulent conveyance in violation of New York's Debtor-Creditor Law, but, as explained below, now concede they have no basis on which to challenge the remaining $275,000 portion of the mortgage.

At a conference before the Court on December 2, 2016, the Knopf's counsel, Eric Berry, stated that the Knopfs damages were "no more than $300,000" (Transcript of December 2, 2014 appearance ["Transcript"] at page 6 line 12).[3]  Mr. Berry continued that the Knopfs' claim was based on the holding of *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995). Mr. Berry went on to explain that he believed *HBE* stood for the proposition that if an attorney charges a flat, nonrefundable fee to an insolvent client, payment of the fee is a fraudulent conveyance. As Mr. Berry told this Court on December 2:

> The question is whether the fee agreement was a flat fee or a refundable fee. If it's a flat fee, then there is a strong presumption that if the client, who pays the flat fee, is in the position that Mr. Sanford and Pursuit were in, then it's a fraudulent conveyance.
> On the other hand, if it's a refundable fee, then the transfer is just a security for fees being incurred going forward and that is probably not a fraudulent conveyance.

Transcript at page 3, line 25 to page 4 line 7.

---

[2] Pursuit secretly sold this property on February 1, 2016 – made possible only because MSF was successful in cancelling the notices of pendency – without paying the note and satisfying the mortgage and instead arranged for $650,000 of the sale proceeds to be escrowed with the title agent to allow the sale to close over MSF's mortgage.

[3] A copy of the Transcript is attached to the Declaration of Howard S. Koh, executed January 13, 2017, (Koh Decl.) as Exhibit A.

As will be shown below, the Knopfs have misread *HBE Leasing*.  It teaches the rather unremarkable point that <u>excessive</u> fixed fees paid by an insolvent client to a lawyer for "unevaluated" services, as part of a conspiracy to defraud the insolvent client's creditors, can be attacked as a fraudulent conveyance, but there is no *per se* ban on fixed fees paid by insolvent clients – they can be reasonable fees for known services, and therefore constitute fair consideration. Here, there is no credible claim that any of MSF' fees were excessive or that the Knopfs were defrauded thereby.  Indeed, Mr. Berry has said in open court: "clearly the amount of work done for the future services exceeds $300,000.  We couldn't possibly contest that in good faith." Transcript page 9, lines 9-11.

Consequently, *HBE Leasing* is inapposite.  However, the Court need not reach the *HBE Leasing* issue, because the record indisputably shows that the $300,000 portion of MSF's mortgage was neither a fixed fee (save as to a *de mimimus* amount), nor nonrefundable.

In any event, the Court did not hear substantive argument on the applicability of *HBE* at the December 2, 2016 conference, but, recognizing that the Knopfs raised a "legal issue" (Transcript page 7, line 23) capable of resolution by reviewing the engagement agreements, the Court suggested that this matter could be resolved on summary judgment and noted that if MSF is successful on this motion "this case will be over." (Transcript at page 10, line 13.)

MSF's engagement agreement with Sanford and his entities unambiguously provides that the $300,000 portion of the mortgage the Knopfs contend is a fraudulent conveyance was to be established as an "escrow" had the promissory note been paid, as it should have been, when the mortgaged property sold on February 1, 2016.  The engagement agreement plainly states that the $300,000 sum was "to cover future work for Pursuit, which is to be billed and paid for at MSF's normal hourly rates."

Indeed, MSF and Sanford specifically called out the categories of future legal work to be performed by MSF on an hourly basis and expressly required MSF to procure Sanford's consent to future withdrawals from the $300,000 escrow, if and when those services were performed. In essence, the $300,000 was nothing more than a reasonable retainer deposit – closely budgeted to cover   specific categories of future legal services Sanford required MSF to perform – which was to be funded into an escrow account upon the sale of PHC.

Because Sanford and MSF realized – and agreed – that the $300,000 portion of the mortgage would fund a <u>refundable</u> retainer deposit to cover future hourly work – that is, any portion remaining unused once the future work was fully performed would be returned – the promissory note secured by the mortgage states that it is for "the principal sum of <u>up to</u> Five Hundred Seventy-Five Thousand and "00/100" dollars. (emphasis added).  The Mortgage itself contains similar language.

In short, the undisputed facts all show that the $300,000 portion of MSF's mortgage now under attack by the Knopfs did not represent a flat fee (again except as to a *de mimimus* part) -- nor was it non-refundable. Rather, the $300,000 portion of the mortgage simply stood as security for a like amount MSF's future fees —a reasonable estimate that MSF and Sanford agreed would cover specific future services Sanford asked MSF to perform, in the main, at its normal hourly rates and which MSF, but apparently not Sanford, contemplated would be funded into MSF's escrow account upon the sale of PHC. Said differently, the $300,000 was a reasonable and refundable retainer deposit for future services to be paid from the PHC sale proceeds.

No genuine issues of fact exist.  Because controlling law offers no support for invalidating the payment by a client, even if then insolvent, of a reasonable, refundable retainer deposit, and because there can be no credible claim that the services MSF rendered after it received the

mortgage did not exceed $300,000 in value (indeed the Knopfs have admitted that they did), the Court should grant MSF summary judgment and dismiss this case.

## STATEMENT OF FACTS

On April 16, 2012, MSF and Pursuit and other companies owned by Sanford (collectively, the "Sanford Entities") entered into an engagement agreement (the "2012 Engagement Agreement") whereby they retained MSF to provide legal services as co-counsel to their then current attorney in defending a lawsuit filed against them several years earlier by Michael and Norma Knopf (the same Plaintiffs as the Plaintiffs in this current action) in New York County Supreme Court, Index No. 113227/2009 (the "Knopfs' State Court Action"). A copy of the 2012 Engagement Agreement is attached to the Koh Decl. as Exhibit B. The Sanford Entities paid MSF a $10,000 retainer and agreed to pay MSF fees based on hourly time charges at MSF's regular hourly rates, along with MSF's out-of-pocket disbursements.  MSF invoiced the Sanford Entities for fees and disbursements totaling $23,530.60, but the Sanford Entities did not make any payments toward those invoices after the initial retainer payment. MSF therefore ceased representing the Sanford Entities in September, 2012 due to lack of payment.

On July 14, 2014, the Sanford Entities sought to re-engage MSF.  Over the next several weeks, MSF and the Sanford Entities negotiated a comprehensive retainer agreement for MSF to provide specific legal services for the Sanford Entities in Knopfs' State Court Action. The Sanford Entities agreed to pay MSF certain contingent fixed fees no later than that time at which Pursuit sold real property, that it then owned, yet could not then liquidate due to improper notices of pendency the Knopfs filed against the properties. This second agreement was entered into on July 29, 2014 (the "2014 Engagement Agreement").  A copy of the 2014 Engagement Agreement is attached to the Koh Decl. as Exhibit C.

With regard to fees, the 2014 Engagement Agreement provided, among other things:

> **_Fees:_** We will charge, and you agree to pay, the following fees:
>
> 1. A $250,000 contingent fixed fee for us to move to cancel the lis pendens on the Property. This fee does not cover an appeal of the ensuing order.
> 2. A contingent fixed fee of $50,000 to oppose the motion to strike if you request us to do this work and if we accept the assignment.

The 2014 Engagement Agreement (emphasis added) also stated:

> MSF agrees that the fees set forth above will be paid out of the proceeds of the sale of the Property, and you shall direct the closing agent or title company to distribute them to us directly. If the lis pendens is cancelled and the sale of the Property takes place before the entire scope of work is completed, <u>then you shall deposit in the Firm's escrow account any remaining unpaid fees</u> as set forth herein (but not as to appeals not then noticed nor any funds with respect to the one-third contingency fee relative to damages/expenses/sanctions), which fees shall be released to the Firm as, if and when the matters are successfully concluded as described herein or otherwise released to you.
>
> You have represented to us that Pursuit owns the Property free and clear other than a mortgage not exceeding $100,000, and you have a buyer for the Property for $2,900,000 and you will use your best efforts to close on a sale within ninety (90) days of an order cancelling the lis pendens. <u>You further agree to cause Pursuit to sign a mortgage in favor of the Firm for $700,000 against the Property</u> .
> . . .

Pursuant to the terms of the 2014 Engagement Agreement, MSF, among other work, filed an Order to Show Cause seeking the cancellation of Notices of Pendency Plaintiffs had placed on real properties owned by Pursuit.  The trial court judge issued a decision ordering the cancellation of the notices of pendency on December 23, 2014 (the "Lis Pendens Cancellation Order"), which MSF presented to the Clerk thus enabling the formal minute book entries evidencing the final cancellation of the notices of pendency on December 31, 2014.  A copy of the Lis Pendens Cancellation Order is attached to the Koh Decl. as Exhibit D.

In January, 2015, after the notices of pendency were cancelled, MSF and the Sanford

Entities negotiated an amendment to the 2014 Engagement Agreement, memorializing certain

accommodations MSF made at Sanford's request and other agreements reached by MSF and

Sanford. This amendment was signed by both parties on January 6, 2015 (the "2015 Engagement

Agreement").  A copy of the 2015 Engagement Agreement is attached to the Koh Decl. as Exhibit

E. The 2015 Engagement Agreement provides, in pertinent part (with notations added in the

brackets):

> 1.     As to the "old" outstanding balance from the prior representation, you will pay and MSF will accept another $10,000, in full satisfaction of that old outstanding balance.  That sum will be paid out of and simultaneously with the refinancing or sale transaction with respect to the apartment or townhouse (or both), which we hope to conclude this week. [This represents an approximately $3,000 compromise by MSF.]
>
> 2.     You will pay and MSF will accept $15,000 in respect of the opposition to the motion to strike, also payable out of the sale or refinancing transaction. [This represents a $35,000 compromise by MSF.]
>
> 3.     You will pay and MSF will accept $250,000 as its contingent fee for the cancellation of the notices pendency, also payable out of the sale or refinancing transaction.  (This brings the immediate payment due MSF to $275,000).
>
> *     *     *     *     *     *
>
> 6.     You will escrow $300,000 with MSF to cover future work for Pursuit, which is to be billed and paid for at MSF's normal hourly rates, including:
>
> •      Motion for CPLR 6514(c) costs and rule 130 sanctions.  We will endeavor to file this motion within 30 days provided you supply us the necessary exhibits to the motion.
>
> •      Possibly a motion to dismiss the fourth cause of action. (Arguably this cause of action has already been effectively dismissed by the recent First Department decision and you and we have not decided whether to bring such a motion or simply to take the position that the claim is no longer viable.)

•       By January 30, 2015, a notice of appeal and pre-argument statement with respect to Justice Tingling's recent decision cancelling the notices of pendency, insofar as it "denied" (by not granting) the prong of our motion seeking costs and sanctions.

•       Defending any motions by Knopf seeking to restrain the sale or refinancing of Pursuit's properties or for pre-judgment attachment against them.

7.      Funds will only be released from the $300,000 escrow account upon your written approval (via email).  MSF will not commence any of this new work before the $300,000 escrow is established.  The $300,000 sum is not to be construed as a limit on the hourly charges, which you agree to pay in full.

8.      A $100,000 fixed fee to handle any appeal by Knopf with respect to Tingling's order cancelling the notices of pendency, and, per our retainer letter, a $25,000 fixed fee to handle any stay motion relative thereto.  The $100,000 appeal fee, if an appeal is prosecuted or defended at your direction (along with the hourly fees for any other work you request but which is not mentioned above), will be payable separately from (not out of) the $300,000 escrow, and will be due before commencement of work; but the $25,000 fee for opposing a stay of the lis pendens cancellation order shall be paid from the $300,000 escrow. [4]

*       *       *       *       *       *

11.     You will today sign a mortgage against PHC in favor of MSF for $575,000 (to secure the $275,000 fee and the $300,000 escrow), which mortgage will be recorded.  MSF will advance the recording charges and mortgage tax associated therewith and shall recover such disbursements from the $300,000 escrow, along with a fee of $1,500 to prepare the mortgage.  You have asked us to prepare

---

4       Notably, the $100,000 "fixed" fee referenced in paragraph 8 to cover any appeal by the Knopfs of the trial court order cancelling the notices of pendency was not covered by or part of the $300,000 portion (or any portion) of MSF's $575,000 mortgage. As the 2015 Engagement Agreement unambiguously provides, Sanford agreed to pay for MSF's services defending against that appeal separately – that is, the parties contemplated that Sanford would have to use additional funds from the PHC closing to pay for defending any appeal of the Lis Pendens Cancellation Order. Neither the $100,000 fixed fee for the appeal itself nor the $25,000 fixed fee for defending against a stay/injunction application was contingent upon a successful outcome. The Knopfs did eventually perfect that appeal, and MSF did successfully defend it (i.e., the Appellate Division affirmed the Lis Pendens Cancellation Order), which paved the way for Pursuit to sell PHC. Sanford never paid MSF the agreed $100,000 fee, or the $25,000 agreed fee to oppose a stay/injunction application (also sought by the Knopfs), and, as Mr. Berry informed the Court, MSF and Sanford are presently engaged in an arbitration proceeding concerning MSF's fees.  Although MSF bargained for, and Sanford agreed, to pay the $100,000 fixed fee relative to defending the Lis Pendens Cancellation Order separate and apart from the $300,000 escrow to be established to cover the other future work to be done on an hourly basis, MSF indisputably defended the Lis Pendens Cancellation Order during the period following the execution of the MSF mortgage.

similar mortgage instruments for the Dorsey firm and for Adam Gordon, which, as an accommodation, we will do for a fee of $1,500 each, provided that any changes or negotiations shall be billed hourly and such fees shall likewise be paid out of the $300,000 escrow.

On that same day, Pursuant to Paragraph 11 of the 2015 Engagement Agreement, Pursuit signed a promissory note for up to $575,000 and a mortgage against PHC in favor of MSF securing the note. Copies of the Note and Mortgage are attached to the Koh Decl. as Exhibits F and G. The Mortgage provides that it is to "secure the payment of an indebtedness in the sum of up to Five Hundred Seventy-Five Thousand and 00/100 Dollars ($575,000)." *See* Koh Decl. Exhibit G.

From January 6, 2015 through September 8, 2015, MSF continued to represent the Sanford Entities. On behalf of Claimants, MSF successfully opposed an appeal by the plaintiffs of the December 23, 2014 decision ordering the notices of pendency to be cancelled, as set forth in paragraph 8 of the 2015 Retainer Agreement. *See* Appellate Division Order upholding cancellation of notices of pendency, a copy of which is attached to the Koh Decl. as Exhibit H. MSF also defended a motion in the Appellate Division seeking to restrain the sale or refinancing of Pursuit's properties,[5] prosecuted a motion to reargue before the Appellate Division, and successfully defended against a motion at the trial level seeking an immediate money judgment or in the alternative a pre-judgment attachment, as set forth in paragraph 6 of the 2015 Retainer, as well as other legal work which Pursuit, through its principal, Sanford, requested that MSF perform. *See*, *generally*, Koh Decl. ¶ 11. As Mr. Koh attests, based on a careful review of the time records, $210,202 of hourly services were rendered after the granting of the mortgage, along with the

---

[5] This motion could not be brought solely as a simple stay application under CPLR 5519 because the notices of pendency had been finally cancelled by the Clerk in advance of the motion. That is, the Knopfs did not move for a stay before the Clerk entered the cancellation of the notices of pendency on the minute books. For this reason, the motion also sought fresh injunctive relief under CPLR 5519 seeking to restrain a sale or refinancing. A copy of the Knopfs' moving papers and Sanford's opposition papers (without the exhibits, which are 830 pages) are attached collectively to the Koh Decl. as Exhibit I.

defense of the Knopfs' Appellate Division motion for a stay/injunction (relative to the Lis Pendens Cancellation Order), at a $25,000 fixed fee (although the actual time charges were approximately $30,000 (Koh Decl. fn.1), and the successful defense of the appeal of the Lis Pendens Cancellation Order itself, at a fixed fee of $100,000 (plus disbursements including appellate printing). The total charges for services rendered after the granting of the mortgage, along with approximately $35,000 in disbursements, thus come to approximately $370,000. The Koh Decl. does not attach the invoices for the post-mortgage period in order to avoid creating a public record thereof, which MSF thought appropriate given Mr. Berry's open-court statements that he could not in good faith contend that these services had a value of less than $300,000; however, MSF is happy to provide them to the Court upon request.

On February 1, 2016, after MSF and Sanford's attorney client relationship terminated, Sanford secretly closed on a sale of PHC without notifying MSF. Sanford arranged for $650,000 of the closing proceeds to be escrowed with a title agent so that the sale could be consummated over -- and without satisfying -- MSF's mortgage. This $650,000 remains in escrow with the title agent today.

## PROCEDURAL HISTORY

The Knopfs initially filed their Complaint on July 1, 2015. [ECF#1] MSF filed its Answer and Affirmative Defenses on August 13, 2015. [ECF#11] The Knopfs filed an Amended Complaint on August 24, 2015, [ECF#14] and MSF filed its Answer to Amended Complaint and Affirmative Defenses on September 11, 2015. [ECF#16]

On November 11, 2015, MSF moved to dismiss the Amended Complaint in its entirety. [ECF#36] This Court issued an Opinion and Order on the MSF motion to dismiss (and the related motion by then co-defendant Pursuit Holdings, LLC), on March 22, 2016 dismissing the claim for

actual fraudulent conveyance under section 276 of the Debtor Creditor Law (i.e. a fraudulent conveyance made with "actual intent . . . to hinder, delay or defraud. . . creditors"). This Opinion and Order allowed the constructive fraudulent conveyance claim to proceed. [ECF#36]

The Knopfs then filed a Second Amended Complaint on March 30, 2016, a copy of which is attached to the Koh Decl. as Exhibit J. The Second Amended Complaint alleges one claim against MSF, for fraudulent conveyance in violation of the Article 10 of the New York Debtor and Creditor Law. This is the operative pleading in this case. MSF filed its Answer to Second Amended Complaint and Affirmative Defenses on April 13, 2016, a copy of which is attached to the Koh Decl. as Exhibit K.

On December 2, 2016, the Court conferenced this case. At this conference, Mr. Berry explained that Plaintiffs were not challenging the fees for services rendered prior to the 2015 Engagement Agreement and that Plaintiffs acknowledge that, prior to that date, MSF had earned at least $275,000 pursuant to the engagement agreements. *Id*. at page 6, lines 8-12. Mr. Berry further explained that "of that 575,000 dollar mortgage, only $300,000 in value was assigned for future services. The other 275 was for prior services that were already earned. Even though I believe our likelihood of success is high, I believe our damages are no more than $300,000." Transcript at Page 6, lines 8-12. With regard to the remaining $300,000, Mr. Berry said:

> If it's a flat fee, the there is a strong presumption that if the client, who pays the flat fee, is in the position that Mr. Sanford and Pursuit were in, then it's a fraudulent conveyance.
> <u>On the other hand, if it's a refundable fee, then the transfer is just a security for fees being incurred going forward and that is probably not a fraudulent conveyance.</u>

*Id*. at page 4, lines 1-7 (emphasis added).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides for the grant of summary judgment where "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).

The moving party bears the burden of showing that no genuine issues exist as to any material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   If the moving party meets its burden, the non-moving party cannot just rest on allegations of its pleadings. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The nonmoving party also cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp*., 758 F.2d 839, 840 (2d Cir.1985).  Further, any evidence put forth in connection with summary judgment must be "admissible in evidence."  Fed. R. Civ. P. 56 (c)(2); *see also Raskin v. Watt Co*., 125 F.3d 55, 66 (2d Cir. 1997) (explaining that the "admissibility of evidence do[es] not change on a motion for summary judgment" and "'is subject to the same rules that govern the admissibility of evidence at trial'") (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 175–76 (5th Cir.1990)).

## ARGUMENT

### PURSUIT'S SECURING PAYMENT OF ITS ATTORNEY FEES BY GRANTING MSF A MORTGAGE OF UP TO $575,000 WAS NOT A FRAUDULENT CONVEYANCE

The sole question before Court is whether the $300,000 portion of the mortgage securing payment of MSF's future legal services, for which the Sanford Entities would be charged hourly,[6] was a fraudulent conveyance. Because the governing documents unambiguously state that these services were to be charged (with only a *de minimus* exception) on an hourly basis and any unused portion would necessarily be returned -- indeed, Sanford's written consent to disbursements of funds from escrow was expressly required – Pursuit's granting of the mortgage was not a fraudulent conveyance.

The 2015 Engagement Agreement, as well as the related Mortgage and Note, are contracts, and interpretation of those contracts, like all other contracts, is a matter for the Court to be decided on the face of the contract and without resort to parol evidence, unless the contract is found to be ambiguous on its face.

"The fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent." *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106, 951 N.Y.S.2d 19, 24 (1st Dep't 2012); *see also Slatt v. Slatt*, 64 N.Y.2d 966, 488 N.Y.S.2d 645 (1985).[7] "[T]he best evidence of what parties to a written agreement intend is

---

[6] As stated above, a *de minimus* ($25,000) portion of the future services secured by the $300,000 escrow fund was to be charged on a fixed fee basis. This related to the work defending against an application for an interim stay pending appeal of the Lis Pendens Cancellation Order.

[7] Federal Courts look to the applicable state law for issues relating to contract interpretation. *Sec. Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 326 (2d Cir.2004) ( "the interpretation of private contracts is ordinarily a question of state law" (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989)); *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618 (2d Cir.2001) ("questions of contract interpretation are, generally, matters of state law"). *Brown v. City of New York*, No. CV 2009–1809(RJD)(MDG), 2012 WL 628496 (E.D.N.Y. Jan. 30, 2012)(federal courts should apply state law to questions of contract interpretation). *See also New Avex, Inc. v. Socata Aircraft Inc.*, No. 02 Civ.6519 DLC, 2002 WL 1998193 (S.D.N.Y. Aug. 29, 2002) (Cote., J.)

what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018, 594 N.E.2d 918 (1992).

A written agreement that is clear and unambiguous on its face must be enforced according to the

plain meaning of its terms, without resort to extrinsic evidence.   *See W.W.W. Assoc. v.*

*Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639 (1990).

> [W]hen parties set down their agreement in a clear, complete
> document, their writing should as a rule be enforced according to its
> terms.  Evidence outside the four corners of the document as to what
> was really intended but unstated or misstated is generally
> inadmissible to add to or vary the writing. That rule imparts stability
> to commercial transactions by safeguarding against fraudulent
> claims, perjury, death of witnesses infirmity of memory and the fear
> that the injury will improperly evaluate the extrinsic evidence.

*Id.* at 162 (internal citations omitted) (finding that the contract, read as a whole plainly manifested

the intention of the parties).  *See also*, *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569-70,

780 N.E.2d 166, 171 (2002) ("[I]f the agreement on its face is reasonably susceptible of only one

meaning, a court is not free to alter the contract to reflect its personal notions of fairness and

equity."); *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 529, 837 N.Y.S.2d 600 (2007) (finding that a

partnership agreement was clear on its face, and no extrinsic evidence was necessary to interpret

it); *Laskey v. Rubel Corp.*, 303 N.Y. 69, 71, 100 N.E.2d 140 (1951) ("It is well settled that, where

parties have reduced their bargain …, to writing, the parol evidence rule applies to prevent its

variance by parol evidence."); *Lanier v. Bowdoin*, 282 N.Y. 32, 38, 24 N.E.2d 732 (1939) (finding

that the partnership agreement between the parties furnished a complete and legal scheme for

distribution of assets and participation in profits and losses as between the partners and "must

control").

---

(applying state law principals to issues of contract interpretation). *Perini Corp. v. City of New York*, 18 F. Supp. 2d
287, 293 (S.D.N.Y. 1998) *aff'd*, 182 F.3d 901 (2d Cir. 1999) (unless there is a significant conflict between federal
policy and state law, federal courts will apply state law to issues of contract interpretation).

Parol evidence is admissible to interpret a contract only where the contract is ambiguous. *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436, 986 N.E.2d 430 (2013) ("Parol evidence – evidence outside the four corners of the documents – is admissible only if a court finds an ambiguity in the contract."). The question whether an agreement is ambiguous is itself a question of law determined from the four corners of the document. *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 255 N.E.2d 709 (1969). Just because parties disagree about the meaning of the words of a contract, does not mean that the contract is ambiguous. *Moore v. Kopel*, 237 A.D.2d 124, 653 N.Y.S.2d 927 (1st Dep't 1997). "'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir.2009) (*quoting Kass v. Kass*, 91 N.Y.2d 554, 696 N.E.2d 174 (1998)). Whether a contract is ambiguous is a question of law for the court. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.2010).

Despite its name, the parol evidence rule is not a rule of evidence, but a rule of substantive New York law. *Woodmere Academy v. Steinberg*, 41 N.Y.2d 746, 750, 363 N.E.2d 1169 (1977); *Fogelson v. Rackfay Const. Co.*, 300 N.Y. 334, 337-338, 90 N.E.2d 881 (1950) (the parole evidence rule is [a]n important principal of substantive law). The parol evidence rule, unlike the hearsay rule, has nothing to do with the quality or reliability of the evidence, and is instead based a policy determination not to permit any evidence, no matter how high in quality, to shed light on the meaning of a written agreement, unless a court, as a matter of law, finds that agreement to be ambiguous on its face.

Plaintiffs contend that the portion of the Mortgage which secures future legal fees, as set forth in Paragraph 6 of the 2015 Engagement Agreement, constitutes a fraudulent conveyance. As the Court explained during the December 2, 2016 conference, that is a legal question. Moreover,

because the 2015 Engagement Agreement is clear on its face, parol evidence need not, and should not, be considered in interpreting the agreement and the related Note and Mortgage.

Paragraph 6 of the 2015 Engagement Agreement provides that Pursuit will escrow with MSF $300,000 for legal work as described in that paragraph.   Koh Decl. Exhibit E. Paragraph 7 sets forth when and how funds can be released from escrow.[8]   *Id*. At the December 2, 2016 conference Mr. Berry contended that the Court of Appeals decision in *HBE Leasing*, 48 F.3d 623 required this Court to find the $300,000 portion of the mortgage was a fraudulent conveyance only if it secured future services charged at a flat fee and was given to MSF while Pursuit was insolvent. Mr. Berry told this Court, "[o]ur claim is based on the legal theory that it is a flat fee given by an insolvent and therefore it violates *HBE v Frank*, Second Circuit Decision, teachings."  Transcript page7 at19-22.

The 2015 Engagement Agreement is clear that the $300,000 was not a non-refundable flat fee, but rather was security for specific future services to be performed by MSF in the main at its normal hourly rates.   The 2105 Engagement Agreement provides that MSF's future services were to "billed and paid for at MSF's normal hourly rates."[9]  Thus these fee for future services were not "flat" and were due when earned, hence they were not "non-refundable."  Indeed, the parties agreed that disbursements from the $300,000 escrow, as the future services were performed, had to be approved by Sanford in writing (email).  So too, the Note and Mortgage also both state that the amounts owed are "up to" $575,000," clearly reflecting that, when the 2015 Engagement

---

[8] Because the mortgage was not satisfied at the closing of the sale of PHC, the escrow was never established.  Instead, $650,000 was deposited in an escrow account held by the title agent, and the closing took place without the MSF mortgage having been satisfied. Koh Decl. at ¶12.

[9] Nevertheless, as noted above, the 2015 Engagement Agreement went on to identify a single category of future services – namely defending a stay/injunction application with respect to the Lis Pendens Cancellation Order – which was to be billed on a fixed fee basis ($25,000) and was payable out of the $300,000 escrow fund intended to be established.

Agreement, Note and Mortgage were signed, the precise charges for the future legal services the

Sanford Entities needed was unknown.

Moreover, the future services that were to be performed by MSF were not vague or

uncertain, but, to the contrary, delineated with specificity. Under the 2015 Engagement Agreement

MSF and Sanford agreed that MSF would perform the following specific categories of future

services:

> • Motion for CPLR 6514(c) costs and rule 130 sanctions. We will endeavor to file this motion within 30 days provided you supply us the necessary exhibits to the motion.

> • Possibly a motion to dismiss the fourth cause of action. (Arguably this cause of action has already been effectively dismissed by the recent First Department decision and you and we have not decided whether to bring such a motion or simply to take the position that the claim is no longer viable.)

> • By January 30, 2015, a notice of appeal and pre-argument statement with respect to Justice Tingling's recent decision cancelling the notices of pendency, insofar as it "denied" (by not granting) the prong of our motion seeking costs and sanctions.

> • Defending any motions by Knopf seeking to restrain the sale or refinancing of Pursuit's properties or for pre-judgment attachment against them.

*See* Koh Aff. Exhibit E.[10]

*HBE Leasing* holds that consideration given for future legal services is a permitted advance

under Debtor Creditor Law § 272(b) where, the legal work to be performed was "fixed and

definite," not of "uncertain scope and duration." 61 F.3d at 1061.  In opposition to MSF's motion

to dismiss, the Knopfs argued that MSF's services were not fixed and definite when Pursuit

---

[10] The 2014 Retainer Agreement required a mortgage of up to $700,000.  Reducing this amount in the 2015 Engagement Agreement to $575,000 is further evidence that the escrow contemplated by the 2015 Engagement Agreement was the result of arms-length bargaining, not an attempt to defraud Sanford's creditors.

mortgaged PHC.  This Court, in denying the Motion to Dismiss, ruled that the Knopfs had adequately alleged that MSF's legal work to performed after Pursuit mortgaged PHC was "too indefinite to constitute fair consideration."  Opinion and Order [ECF # 36] at 11. After discovery, however, the Knopfs, for good reason, have, apparently, abandoned this argument.  The Knopfs no doubt abandoned their claim that MSF's future legal work (described in the 2015 Engagement Agreement) was so indefinite that the $300,000 portion of the mortgage constituted a fraudulent conveyance because, discovery, including the deposition of Stephen Meister, the principal MSF attorney responsible for representing the Sanford Entities, clearly revealed that specific categories of immediately necessary legal work were agreed to by MSF and Sanford, based on the then posture of the Knopf State Court Action.

That is, once MSF had gotten Justice Tingling to grant the Lis Pendens Cancellation Order – by decision dated December 23, 2014 – MSF and Sanford knew full well that Mr. Berry, on behalf of the Knopfs, would, at a minimum:

- Appeal the Lis Pendens Cancellation Order;

- Seek a stay/injunction pending appeal with respect to the Lis Pendens Cancellation Order;

- Attempt to immediately procure a money judgment from the state trial court (the case had been reassigned to Justice Braun when Justice Tingling retired and became the Court Clerk) based on the Appellate Division's December 11, 2014 decision awarding summary judgment to the Knopfs on their claim for non-payment of loans to Sanford; and

- Alternatively seek a pre-judgment attachment of Sanford and Pursuit's assets.

In addition, Sanford wanted to pursue a claim for costs in cancelling the lis pendens under CPLR 6514(c) though that relief had not been granted by Justice Tingling in the Lis Pendens Cancellation Order.  Thus, Sanford and MSF had a detailed and specific understanding as to the various categories of legal work to be undertaken by MSF following the granting of the MSF mortgage.

Now that discovery is over, the Knopfs concede that charges that MSF incurred after the Pursuit gave its mortgage were legitimate. At the December 2, conference, Mr. Berry said "clearly the amount of work done for the future services exceeds $300,000.  We couldn't possibly contest that in good faith." Transcript page 9, lines 9-11.

Independently, MSF's promise to perform specific categories of future legal services was fair consideration for the $300,000 portion of the mortgage because: (1) the charges for those services were, with one *de minimus* exception, to be computed based on MSF's normal hourly rates,  (2) such charges were incurred only upon MSF providing actual services and Sanford approving the invoices, and (3) the *de minimus* portion charged on a fixed fee basis -- $25,000 to oppose a complex motion to stay the Lis Pendens Cancellation Order, or in the alternative for an injunction pending appeal -- was manifestly reasonable (as Mr. Berry has admitted in open court). The *HBE Leasing* rule exists to avoid putting "the Bar in a position of being subject to frequent suspicion of unjust involvement in schemes" at the expense of creditors by accepting payments for "unevaluated future legal services."  *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Circ. 1995). Simply put, *HBE Leasing* prohibits a debtor from deliberately overpaying its lawyer in order to avoid giving its money to a creditor.  Here, there can be no genuine question Sanford did not transfer a mortgage lien to MSF to avoid paying the Knopfs.

Because MSF's fees for services after Pursuit gave its mortgage were, in the main, always going to be computed at its regular hourly rates, subject to invoices submitted for Sanford's future

approval in writing, the problem *HBE Leasing* addresses does not exist here.  Moreover, here the creditor admits that MSF rendered valuable services after the mortgage issued. Hence *HBE* does not apply.  <u>If</u>, contrary to the express language of the 2105 Engagement Agreement, MSF's had been entitled to a $300,000 "fee" upon the sale of PHC, irrespective of how much, if any, future legal services MSF might render, <u>then</u> *HBE Leasing* might apply.  But MSF's had to <u>earn</u> its secured fee billable-hour by billable-hour. Thus, *HBE Leasing* is inapposite. Nor can the Knopfs point to any snippets of testimony concerning what the 2015 Engagement Agreement might have meant; the unambiguous terms of the 2015 Engagement Agreement control.

Other cases involving the payment of legal fees by allegedly insolvent entities, hold that transfers to secure estimations of legal fees are valid.  For example, in *Gala Enters., Inc. v. Hewlett Packard Co*., 989 F. Supp. 525, 528-29 (S.D.N.Y. 1998), a case that cites to *HBE Leasing*, the court found a transfer of $500,000 to a law firm at the outset of representation on a criminal matter was not a fraudulent conveyance "given the amount of time that the Firm reasonably could be expected to spend on the matter."  In contrast to *Gala*, the $575,000 mortgage that Pursuit gave MSF was in part to pay past due charges, and to the extent of $300,000, intended to secure the establishment of a <u>fully refundable</u> $300,000 escrow to be used to pay for specific future services in large part performed at MSF's normal hourly billing rates. Thus, if MSF provided only $1,000 worth of future legal services just for the Sanford Entities after January 6, 2015, the mortgage only secured a total obligation of $276,000, the $275,000 that MSF had already earned and the hypothetical $1,000.  Hence, this case is *stronger* for the law firm than *Gala*.

The $300,000 portion of the mortgage was nothing more than a reasonable, refundable retainer – yet to be earned -- to cover specific future legal services Sanford requested MSF to perform. Such retainers are paid every day in New York City.

In another case, to secure payment of current and future legal fees, the defendant gave the law firm a note secured by a pledge of essentially all its assets.  The court similarly found that this transfer was not fraudulent:

> Part(b) of Debtor & Creditor Law 272 acknowledges fair consideration from the perspective of a transferee. Qualified providers of legal representation act reasonably when they take steps to assure their own compensation, and for that, they appropriately demand a retainer. If not available in cash a retainer may take the form of a guarantee or a lien like that which the debtor gave . . . lawyers have a right to expect fair compensation. For this reason, reasonable retainers are inherently received in good faith.

*In re Successor Borrower Servs., LLC*, 489 B.R. 336, 341 (Bankr. W.D.N.Y. 2013).

*Successor Borrower* is particularly instructive because there, the client's note was secured by "essentially all of Successor's assets" (*Id*. at 338). In contrast, the $300,000 portion of the MSF mortgage represents a small percentage of Pursuit's assets, and was earned only after MSF rendered specific future legal services and Sanford agreed to the charges.[11]

In all events, as Mr. Berry stated in open court, "[o]n the other hand, if it's a refundable fee, then the transfer is just a security for fees being incurred going forward and that is probably not a fraudulent conveyance." There can be no doubt that the entirety of $300,000 portion of the mortgage was fully refundable – that is, that the $300,000 escrow fund was to be refunded if and to the extent the future services were not performed.  This included the $25,000 fixed fee component to defend the stay/injunction application it was anticipated the Knopfs would make to

---

[11] In the Second Amended Complaint, Plaintiffs allege a lack of fair consideration solely based on their unfounded speculation that the services provided by MSF to Pursuit were limited and "obviously far less than $575,000" (Am. Compl. ¶ 29).   However, since drafting that pleading, Mr. Berry has admitted in open court that the Knopf's claim cannot possibly exceed $300,000, that the portion of the mortgage that secured past due fees of $275,000 is not assailable (and that those fees were reasonable and earned) and that the future fees exceeded $300,000 in value. Regardless, $300,000 represents a tiny portion (10%) of the value of PHC, Indeed, Plaintiffs Allege that the sale of PHC resulted in $3 million in proceeds. (Am. Complaint ¶ 41). This does not take into account the multi-million-dollar value of Pursuit's 10 Bedford Street condominium units.

the Appellate Division. Since Plaintiffs have admitted their claim fails if the $300,000 is refundable, and the Engagement Agreement unambiguously provides that the $300,000 is fully refundable, the case should be dismissed.

## CONCLUSION

Plaintiffs now concede they cannot attack the $275,000 portion of the MSF mortgage given to secure payment of past due fees because those fees were duly earned before the mortgage was granted and therefore these past services constitute fair consideration. Plaintiffs' challenge as to the remaining $300,000 portion of the MSF mortgage fails as a matter of law; though Plaintiff contends that the $300,000 portion of the mortgage they still challenge was given to secure "fixed" and "non-refundable" fees due from an insolvent client, the unambiguous governing documents – the retainer agreements – undisputedly show that $275,000 of the $300,000 portion was intended to secure specific categories of future legal work to be performed at MSF's normal hourly rates. As to the *de minimus* $25,000 segment of the $300,000 portion of the mortgage that was intended to secure a fixed fee, the fee was unquestionably reasonable, and Plaintiffs have already admitted as much in open court. In all events, there can be no dispute that the entirety of the $300,000 was fully refundable – Sanford had to approve disbursements from the escrow fund as future services were rendered.

The engagement agreements also show that Sanford and MSF agreed that a separate $100,000 fixed fee for defending an appeal of the Lis Pendens Cancellation Order was to be paid separate and apart from the $300,000 escrow, and it is undisputed that those appellate services were performed after the issuance of the mortgage, were successful, and were not paid.

In sum, there is no genuine dispute of fact that, in exchange for the $300,000 portion of the mortgage, MSF rendered future services after the granting of the mortgage – between its normal

hourly time charges for hourly work, the $25,000 fixed fee for defending the stay/injunction motion regarding the Lis Pendens Cancellation Order, and the appeal of that order (never paid for) – far exceeding $300,000.  These services constitute fair consideration for the $300,000 portion of the mortgage and defeat Plaintiffs' remaining challenge as a matter of law. Indeed, Mr. Berry himself said that "clearly the amount of work done for the future services exceeds $300,000.  We couldn't possibly contest that in good faith." Transcript page 9, lines 9-11.  Mr. Berry also said: "[o]n the other hand, if it's a refundable fee, then the transfer is just a security for fees being incurred going forward and that is probably not a fraudulent conveyance. *Id*. at page 4, lines 5-7.

*HBE Leasing* does not stand for the proposition that there is per se bar to fixed fee arrangements with insolvent clients.  Even if it did, that would only result in the invalidation of a $25,000 portion of a $575,000 mortgage.  Instead, *HBE Leasing* permits the setting aside of unreasonable fixed fee payments from insolvent clients for "unevaluated future legal services" – a situation not presented in the case at bar.  In all events, controlling law makes clear that the guiding principle to be applied by courts testing fraudulent conveyances to lawyers, as in other fraudulent conveyance cases, is whether fair consideration was given by the law firm.  There is thus no per se bar to fixed fees, where they are reasonable, nor is there any bar to refundable retainer deposits. Here, the Court's job is made easy, because Plaintiffs have admitted that the future services MSF performed were worth at least $300,000 and the controlling document proves that the entirety of the $300,000 was refundable.  There is nothing left to try.

Because no genuine issues of fact exist, Plaintiffs' remaining challenge to the $300,000 portion of the MSF mortgage fails as a matter of law.  The Court should therefore dismiss the sole count of the Second Amended Complaint, alleging that the $300,000 portion of the Mortgage was a fraudulent conveyance, and direct the entry of summary judgment for MSF.

Dated: January 13, 2017

/s/  Howard S. Koh_____
Howard S. Koh, Esq.
Randi Lane Maidman, Esq.
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, New York 10017
(212) 655-3500

*Attorneys for Defendant Meister Seelig &
Fein LLP*