UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
NORMA KNOPF and MICHAEL KNOPF,          :          15cv5090(DLC)
                                        :
                 Plaintiffs,            :          OPINION AND ORDER
        -v-                             :
                                        :
MEISTER, SEELIG & FEIN, LLP and         :
PURSUIT HOLDINGS, LLC.,                 :
                                        :
                 Defendants.            :
                                        :
--------------------------------------- X

APPEARANCES:

For the plaintiffs:
Eric W. Berry
Berry Law PLLC
5 Columbus Circle, 8th Floor
New York, NY 10019

For defendant Meister, Seelig & Fein, LLP:
Howard S. Koh
Randi L. Maidman
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017

DENISE COTE, District Judge:

    Defendant Meister, Seelig & Fein LLP ("MSF") has moved for

summary judgment on the sole remaining claim against them in

this long-running dispute, a claim of constructive fraudulent

conveyance brought under the New York Debtor and Creditor Law

("DCL").  For the following reasons, MSF's motion is granted.

## BACKGROUND

    The tortured history of this litigation is set out in two

prior Opinions, which are incorporated by reference and with which familiarity is assumed. Knopf v. Meister, Seelig & Fein, LLP, 15cv5090 (DLC), 2016 WL 1166368 (S.D.N.Y. Mar. 22, 2016)("Knopf II"); Knopf v. Meister, Seelig & Fein, LLP, 15cv5090 (DLC), 2015 WL 6116926 (S.D.N.Y. Oct. 16, 2015) ("Knopf I"). This Opinion summarizes only those facts relevant to the instant motion. The following facts are either undisputed or taken in the light most favorable to the plaintiffs.

In brief, Norma Knopf and Michael Knopf (the plaintiffs or "Knopfs") made two loans at issue in this action to defendant Pursuit Holdings, LLC ("Pursuit"). When the Knopfs filed litigation in state court in connection with those loans, Pursuit and its principal Michael Sanford ("Sanford") hired MSF to represent them. During that litigation, Pursuit extended a real estate mortgage ("the Mortgage") to MSF as security for its obligation to pay MSF's legal fees. The parties now dispute whether $300,000 of the Mortgage securing payment for future legal services was a constructive fraudulent conveyance to MSF.

## I. Proceedings in State Court

In 2006, the Knopfs extended two loans to Pursuit: $1,690,860 to finance the purchase of a residence located at 44 East 67th Street, Unit PHC ("PHC"), and $3,250,000 to finance the purchase of three condominium units located at 10 Bedford

Street (the "Townhouses," collectively with PHC, the "Properties").  The loan agreements included a provision in which Sanford, on behalf of Pursuit, agreed not to sell, mortgage, hypothecate, or otherwise encumber the acquired real estate.  The Knopfs subsequently commenced an action against Sanford and Pursuit, among others, in New York County Supreme Court, alleging that Sanford and Pursuit had breached the loan agreements by failing to grant them a mortgage on the Properties.  They sought money damages as well as imposition of a constructive trust on the Properties.

In connection with their claims in the state court action, the Knopfs filed notices of pendency against the Properties on September 18, 2009 (the "Initial Notices").  While Justice Milton Tingling refused to extend the Initial Notices, the Appellate Division, First Department, did extend them.  Knopf v. Sanford, 972 N.Y.S.2d 893, 894 (1st Dep't 2013).

On April 16, 2012, Pursuit and other companies owned by Sanford ("the Sanford Entities") retained MSF to represent them in defending against the Knopfs' state court action.  They executed a 2012 retainer agreement.  MSF ceased representing the Sanford Entities in September 2012.

On July 29 2014, the Sanford Entities and MSF signed a second engagement agreement ("the 2014 Engagement Agreement")

3

for MSF to provide legal services in connection with the state court action.  The 2014 Engagement Agreement indicated that MSF would represent Pursuit for the limited purposes of (1) moving to cancel the notice of pendency on PHC, (2) moving for partial summary judgment solely as to the portion of the Knopfs' constructive trust claim relating to PHC, and (3) prosecuting a claim on behalf of Pursuit to recover damages/expenses incurred due to the notice of pendency filed by the Knopfs against PHC and seeking sanctions.  MSF would also represent Pursuit or all defendants in any appeals taken concerning these three matters or any motion to stay any order cancelling the notices of pendency, among other things.

With respect to fees, the 2014 Engagement Agreement provided:

> MSF agrees that the fees set forth above will be paid out of the proceeds of the sale of the Property, and you shall direct the closing agent or title company to distribute them to us directly.  If the lis pendens is cancelled and the sale of the Property takes place before the entire scope of work is completed, then you shall deposit in the Firm's escrow account any remaining unpaid fees as set forth herein (but not as to appeals not then noticed nor any funds with respect to the one-third contingency fee relative to damages/expenses/sanctions), which fees shall be released to the Firm as, if and when the matters are successfully concluded as described herein or otherwise released to you.
>
> You have represented to us that Pursuit owns the Property free and clear other than a mortgage not

4

exceeding $100,000, and you have a buyer for the
Property for $2,900,000 and you will use your best
efforts to close on a sale within ninety (90) days of
an order cancelling the lis pendens.  <u>You further
agree to cause Pursuit to sign a mortgage in favor of
the Firm for $700,000</u> against the Property . . . .

(Emphasis supplied.)[1]

After the 2014 Engagement Agreement was signed, MSF filed
an Order to Show Cause seeking the cancellation of the notices
of pendency.  Through a decision by the Appellate Division on
December 11, 2014, the Knopfs won summary judgment on their
breach of contract claims.[2]  <u>Knopf v. Sanford</u>, 1 N.Y.S.3d 18, 19
(1st Dep't 2014).  But, the Appellate Division also held that
the Knopfs had failed to establish their entitlement to summary
judgment on their constructive trust claim because they had not
made an evidentiary showing that money damages would be
inadequate.  <u>Id</u>. at 20.  Justice Tingling cancelled the notices
of pendency on December 23, and the Clerk noted the final
cancellation of the notices of pendency on the appropriate
minute books on December 31, 2014.

With the notices of pendency vacated, MSF and Pursuit acted
quickly to execute a mortgage on PHC (the "Mortgage").  On

---

[1]  This $700,000 mortgage was never granted.

[2]  Despite the grant of summary judgment on their contract
claims, the Knopfs have not yet obtained a final judgment in the
state court action.

January 6, 2015, MSF and Pursuit signed an amendment to the 2014

Engagement Agreement ("the 2015 Amendment").  It is this

document that is at the heart of the instant motion for summary

judgment.  The 2015 Amendment "supplements and modifies" the

2014 Engagement Agreement and provides, in pertinent part:

> 6.  <u>You will escrow $300,000 with MSF to cover future
> work</u> for Pursuit, which is to be billed and paid for
> at MSF's normal hourly rates, including:[3]
>
> - Motion for CPLR 6514(c) costs and rule 130
>   sanctions.  We will endeavor to file this motion
>   within 30 days provided you supply us the necessary
>   exhibits to the motion.
>
> - Possibly a motion to dismiss the fourth cause of
>   action.  (Arguably this cause of action has already
>   been effectively dismissed by the recent First
>   Department decision and you and we have not decided
>   whether to bring such a motion or simply to take
>   the position that the claim is no longer viable.)
>
> - By January 30, 2015, a notice of appeal and pre-
>   argument statement with respect to Justice
>   Tingling's recent decision cancelling the notices
>   of pendency, insofar as it "denied" (by not
>   granting) the prong of our motion seeking costs and
>   sanctions.
>
> - Defending any motions by Knopf seeking to restrain
>   the sale or refinancing of Pursuit's properties or
>   for pre-judgment attachment against them.

---

[3]  At a deposition on September 29, 2016, MSF's Stephen Meister
acknowledged that the future legal services described in
paragraph 6 of the 2015 Amendment were not necessarily limited
to the four items specifically listed, saying "[i]t says
including, so it's not limited to those items if it's for
Pursuit.  If it's for Pursuit."

7.  <u>Funds will only be released from the $300,000
escrow account upon your written approval</u> (via email).
MSF will not commence any of this new work before the
$300,000 escrow is established.  The $300,000 sum is
not to be construed as a limit on the hourly charges,
which you agree to pay in full.

8.  A $100,000 fixed fee to handle any appeal by Knopf
with respect to Tingling's order cancelling the
notices of pendency, and, per our retainer letter, a
$25,000 fixed fee to handle any stay motion relative
thereto.  The $100,000 appeal fee, if an appeal is
prosecuted or defended at your direction (along with
the hourly fees for any other work you request but
which is not mentioned above), will be payable
separately from (not out of) the $300,000 escrow, and
will be due before commencement of work; but the
$25,000 fee for opposing a stay of the lis pendens
cancellation order shall be paid from the $300,000
escrow.

        . . .

11.  <u>You will today sign a mortgage against PHC in
favor of MSF for $575,000 (to secure the $275,000 fee
and the $300,000 escrow)</u>, which mortgage will be
recorded.  MSF will advance the recording charges and
mortgage tax associated therewith and shall recover
such disbursements from the $300,000 escrow, along
with a fee of $1,500 to prepare the mortgage.  You
have asked us to prepare similar mortgage instruments
for the Dorsey firm and for Adam Gordon, which, as an
accommodation, we will do for a fee of $1,500 each,
provided that any changes or negotiations shall be
billed hourly and such fees shall likewise be paid out
of the $300,000 escrow.

12.  These agreements supercede and modify our written
retainer agreement of July 29, 2014, and the contents
hereof shall control whenever inconsistent with the
retainer letter.

(Emphasis supplied).

    Pursuant to Paragraph 11 of the 2015 Amendment, Pursuit

executed a promissory note on January 6 in favor of MSF for up to $575,000. That day, also pursuant to Paragraph 11, Pursuit signed the Mortgage in favor of MSF against PHC for $575,000. The Mortgage provides that it is to "secure the payment of an indebtedness in the sum of up to Five Hundred Seventy-Five Thousand and 00/100 Dollars ($575,000)."[4] (Emphasis supplied.) On January 7, 2015, MSF's Stephen Meister emailed a potential buyer of PHC, writing: "I have gotten the lis pendens cancelled, and the apartment is now freely transferrable and financeable."

That same day, January 7, counsel for the Knopfs gave MSF notice that the plaintiffs intended to appeal Justice Tingling's December 23, 2014 order cancelling the notices of pendency. The Knopfs' appeal sought, among other things, a preliminary injunction enjoining the defendants from "transferring, mortgaging, or impairing" the Properties. On January 8, Justice Rolando Acosta issued an interim order staying the defendants from "encumbering the subject property pending an expedited motion to a full panel of this Court . . . ."

MSF continued to represent the Sanford Entities from January 6 through September 8, 2015. During that time MSF successfully opposed an appeal of Justice Tingling's December

---

[4] MSF delivered the Mortgage to a title agent for filing and the Mortgage was recorded on January 21, 2015.

23, 2014 decision cancelling the notices of pendency. MSF also defended two motions related to the state court action as set forth in paragraph 6 of the 2015 Amendment and performed additional work requested by Sanford on behalf of Pursuit. It is now undisputed that MSF's work during this period surpassed in value the $300,000 in future fees secured by the Mortgage. On July 2, 2015, the Appellate Division affirmed Justice Tingling's December 2014 order cancelling the notices of pendency.

## II. Proceedings in Federal Court

On July 1, 2015, the Knopfs filed the instant federal diversity action against Pursuit and MSF, seeking to set aside the Mortgage to MSF as a fraudulent conveyance. The complaint asserted two claims. First, it asserted against both defendants that the $575,000 Mortgage granted to MSF was made for less than fair consideration and constituted a constructive fraudulent conveyance under §§ 273, 274, and 275 of the DCL.[5] The complaint also alleged that the Mortgage was made with actual intent to defraud the Knopfs and was therefore an actual fraudulent conveyance under § 276 of the DCL. The Knopfs also sought a

_____

[5] The complaint cites to the New York Civil Practice Law and Rules ("CPLR") instead of the DCL. Because the parties' other submissions unambiguously refer to the DCL, these claims were construed accordingly in Knopf II.

permanent injunction against Pursuit, pursuant to § 279(a) of
the DCL, enjoining it from transferring or further encumbering
the Properties.  The Knopfs filed an amended complaint on August
24, and the defendants filed their answers to the amended
complaint in September 2015.

In connection with the federal action, the Knopfs also
filed new notices of pendency on the Properties ("Second
Notices").  On October 16, the Court cancelled both notices of
pendency.  Knopf I, 2015 WL 6116926.  On March 22, 2016, the
Court granted MSF's motion to dismiss the Knopfs' claim for
actual fraudulent conveyance but permitted their claims for
constructive fraudulent conveyance to proceed.  Knopf II, 2016
WL 1166368, at *8.[6]

On March 30, the Knopfs filed a second amended complaint
("SAC") asserting a single cause of action against Pursuit and
MSF for constructive fraudulent conveyance.[7]  The Knopfs were
permitted to amend the complaint to allow them to allege facts,

---

[6]  Knopf II also granted Pursuit's motion to dismiss the
plaintiffs' claim for a permanent injunction and denied
Pursuit's request for attorney's fees pending the conclusion of
the federal proceedings.  Id. at *7-8.

[7]  On April 12, Dorsey & Whitney LLP, which had been co-counsel
for Pursuit in federal court, moved to withdraw due to Pursuit's
non-payment of legal fees.  Pursuit's other federal counsel,
Dechert LLP, had been permitted to withdraw on April 1.  Co-
counsel's motion was granted, and on May 9, the Court ordered
the Clerk to enter a default against Pursuit.

which had been recited in their memorandum in opposition to their motion to dismiss, supporting their claim that Pursuit was insolvent at the time the Mortgage was executed -- with its liabilities of roughly $8.64 million exceeding its alleged assets of $8.36 million.

Following the conclusion of discovery on the constructive fraudulent conveyance claim, a conference was held on December 2, 2016 to discuss anticipated summary judgment practice. Plaintiffs' counsel explicitly abandoned any claim that the Knopfs had a right to $275,000 of the $575,000 Mortgage. Plaintiffs' counsel explained that he expected to prevail at trial with respect to the remaining $300,000 of the Mortgage amount by demonstrating two things: (1) testimony from their appraiser would establish that Pursuit was insolvent at the time the Mortgage was entered, and (2) relying on HBE Leasing Corp. v. Frank, 61 F.3d 1054 (2d Cir. 1995), the Knopfs would establish that the $300,000 extended to MSF for future legal services and secured by the Mortgage represented a flat fee given by the insolvent Pursuit. Plaintiffs' counsel explained that they had abandoned any claim that $275,000 of the Mortgage amount was a constructive fraudulent conveyance since it secured payment of fees already earned. In contrast, the $300,000 was for future legal fees. Although plaintiffs' counsel quibbled

with some billing entries on the MSF billing records, he also abandoned any claim that MSF had not ultimately performed legal work for which it was owed $300,000. He admitted, "clearly the amount of work done for the future services exceeds $300,000. We couldn't possibly contest that in good faith." Accordingly, as described by plaintiffs' counsel, the Knopfs would be able to prevail at trial with respect to $300,000 of the Mortgage because they would be able to establish that the $300,000 reflected a "flat" or "refundable" fee:

> The question is whether the fee agreement was a flat fee or a refundable fee. If it's a flat fee, then there is a strong presumption that if the client, who pays the flat fee, is in the position that Mr. Sanford and Pursuit were in, then it's a fraudulent conveyance. On the other hand, if it's a refundable fee, then the transfer is just a security for fees being incurred going forward and that is probably not a fraudulent conveyance.

On January 13, 2017, defendant MSF moved for summary judgment on the sole remaining claim brought against MSF, the claim for constructive fraudulent conveyance. The motion was fully submitted on February 28. Relying on the representations made by plaintiffs' counsel at the December conference, the motion sought to demonstrate that the $300,000 secured by the Mortgage was a "reasonable and refundable retainer deposit for future services to be paid from the PHC sale proceeds" and not a flat fee.

12

Meanwhile, on February 1, 2016, Sanford had closed on a sale of PHC. $650,000 of the closing proceeds were escrowed with a title agent to allow the sale to close without satisfying the Mortgage to MSF.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015). "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted)

(emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Summary judgment is only proper in cases involving contract interpretation if the language of the contract is "wholly

unambiguous." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243,

257 (2d Cir. 2002) (citation omitted). "When the language of a

contract is susceptible to different interpretations and where

there is relevant extrinsic evidence of the parties' actual

intent, then the contract's meaning becomes an issue of fact

precluding summary judgment." Id. (citation omitted) (applying

New York law).[8]

Under New York law, courts determine whether the terms of a

contract are ambiguous as a matter of law. Law Debenture Trust

Co. v. Maverick Rube Corp., 595 F.3d 458, 465 (2d Cir. 2010).

In determining whether a contract term is ambiguous, courts

construe it "in accordance with the parties' intent." In re

World Trade Ctr. Disaster Site Litig., 754 F.3d 114, 122 (2d

Cir. 2014)(New York law). The best evidence of the parties'

intent is generally the written contract itself. Id. Contract

terms should be given their "plain meaning," and a contract

should be construed so as to give "full meaning and effect to

all of its provisions." Olin Corp. v. Am. Home Assurance Co.,

___

[8] It is undisputed that New York law governs issues of contract
interpretation in this case. The parties rely on New York law
in their briefs. Such implied consent to using New York law "is
sufficient to establish choice of law." Santalucia v. Sebright
Transp., Inc., 232 F.3d 293, 296 (2d Cir. 2000) (citation
omitted). In addition, the 2012 retainer agreement and 2014
Engagement Agreement identify New York law as the governing law.

704 F.3d 89, 99 (2d Cir. 2012) (citation omitted)(New York law).

A contract is unambiguous when its language "has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014)(New York law). By contrast, a contract is ambiguous if its language "could objectively suggest more than one meaning to one familiar with the customs and terminology of the particular trade or business." Id. Parol evidence is admissible to assist in the interpretation of a contract "only when the language of the contract is ambiguous." Galli v. Metz, 973 F.2d 145, 153 (2d Cir. 1992) (citation omitted) (New York law).

The sole question presented by MSF's motion for summary judgment is whether $300,000 of the Mortgage was a flat fee or a refundable retainer for future services. As acknowledged by plaintiffs' counsel at the December 2016 conference, if fair consideration is given for future legal services there is no fraudulent conveyance even where the transferor is insolvent. To be unlawful, both conditions must be satisfied.

> Under the DCL, a conveyance by a debtor is deemed
> constructively fraudulent if it is made without 'fair
> consideration,' and (inter alia) if one of the
> following conditions is met: (i) the transferor is
> insolvent or will be rendered insolvent by the
> transfer in question, DCL § 273; (ii) the transferor
> is engaged in or is about to engage in a business

16

transaction for which its remaining property
constitutes unreasonably small capital, DCL § 274; or
(iii) the transferor believes that it will incur debt
beyond its ability to pay, DCL § 275.

In re Sharp Int'l Corp., 403 F.3d 43, 53 (2d Cir. 2005)(emphasis

supplied).

In general, the burden of proving a lack of fair

consideration is upon the party challenging the conveyance.

Joslin v. Lopez, 765 N.Y.S.2d 895, 897 (2d Dep't 2003).  As

defined by DCL § 272(b), fair consideration is given for

property or an obligation "[w]hen such property, or obligation

is received in good faith to secure a present advance or

antecedent debt in amount not disproportionately small as

compared with the value of the property, or obligation

obtained."  N.Y. D.C.L. § 272(b) (emphasis supplied).  As

relevant here, for a conveyance of property to have been made

for fair consideration, therefore, the exchange must be for "a

fair equivalent of the property received; and . . . such

exchange must be in good faith."  Sharp, 403 F.3d at 53

(citation omitted).  "[W]hat constitutes fair consideration

under section 272 must be determined upon the facts and

circumstances of each particular case."  United States v.

McCombs, 30 F.3d 310, 326 (2d Cir. 1994) (citation omitted).

For future legal services to constitute fair consideration,

those services must not be of "considerably uncertain scope and duration."  HBE Leasing, 61 F.3d at 1061.

To demonstrate bad faith in the context of a constructive fraudulent conveyance claim, the claimant must show more than the transferee's knowledge that the transferor is insolvent or that it wrongfully obtained the transferred funds at the expense of other creditors.  Boston Trading Grp., Inc. v. Burnazos, 835 F.2d 1504, 1512 (1st Cir. 1987).  Rather, a showing of bad faith requires the transferor's participation in the fraudulent activity.  Id.

> Whatever "good faith" may mean, however, we believe it
> does not ordinarily refer to the transferee's
> knowledge of the source of the debtor's monies which
> the debtor obtained at the expense of other creditors.
> To find a lack of "good faith" where the transferee
> does not participate in, but only knows that the
> debtor created the other debt through some form of,
> dishonesty is to void the transaction because it
> amounts to a kind of 'preference'-- concededly a most
> undesirable kind of preference, one in which the
> claims of alternative creditors differ considerably in
> their moral worth, but a kind of preference
> nonetheless.

Id.  See Sharp, 403 F.3d at 54-55; In re Bernard L. Madoff Inv. Sec., LLC, 440 B.R. 243, 265 (Bankr. S.D.N.Y. 2010); In re Actrade Fin. Techs. Ltd., 337 B.R. 791, 805 (Bankr. S.D.N.Y. 2005).

MSF has shown that the $300,000 of the Mortgage at issue was received in good faith to secure future legal services whose

18

value would not be disproportionately small when compared to the secured amount of $300,000.  There is no basis, for instance, to find that the Mortgage was structured to overpay MSF in order to deprive the Knopfs of money due to them or that it allowed MSF to receive any funds unless it actually performed legal work that earned payment of the funds.  Indeed, the Mortgage only secured an indebtedness of "up to" $575,000.  If MSF did not perform any of the outlined work in paragraph 6 of the 2015 Amendment, then the Mortgage would have entitled MSF to receive only $275,000.  Moreover, the 2015 Amendment does not describe a fixed fee arrangement for future legal work of uncertain scope and duration –– it unambiguously describes a refundable retainer to cover defined items of future legal work.  Save for a $25,000 fixed fee to oppose a stay of Judge Tingling's order cancelling the notices of pendency, the 2015 Amendment provided that the payment of MSF's future legal fees secured by the Mortgage would be held in escrow and incurred and billed "at MSF's normal hourly rates."  Thus, the Knopfs' written approval was required to release funds from the $300,000 escrow account.

In their opposition to MSF's motion, the Knopfs no longer contend that the 2015 Amendment treated the $300,000 of the Mortgage amount as a fixed sum to which MSF would be entitled even without performance of work.  Nor do they contend that MSF

failed to perform work worth $300,000 on the specific tasks outlined in the 2015 Amendment. They do, however, argue that the economic benefit from the promised legal services was "disproportionately small" at the time the Mortgage was executed. They reason that the economic benefit from MSF's legal work was disproportionately small because the anticipated legal work was largely "meritless," considering that (1) the Knopfs had already won a motion for summary judgment in state court, and (2) it is likely that the state court will allow the Knopfs to liquidate Pursuit's assets in the event that the Knopfs are ever able to obtain a judgment. This argument incorrectly measures value. The issue is whether the legal work performed by MSF is fairly valued at $300,000 when measured by the hours it reasonably took to perform the enumerated tasks multiplied by a reasonable hourly rate. As the Knopfs conceded at the December 2 conference, there is no basis to suggest that MSF did not earn $300,000 when measured by that standard.

In a related argument, the Knopfs contend that the $300,000 secured by the Mortgage may not be fair consideration since an MSF attorney testified in his deposition that the $300,000 would have been available to pay MSF for other future services beyond those specifically outlined in the 2015 Amendment. In describing the future services covered by paragraph 6 of the

2015 Amendment MSF's Stephen Meister noted, "[the 2015 Amendment] says including, so it's not limited to those items if it's for Pursuit. If it's for Pursuit." This argument fails as well. Since MSF indisputably earned at least $300,000 by performing the tasks delineated in the 2015 Amendment, it is unnecessary to consider what it might have been entitled to collect if it had not.

In their opposition to MSF's motion, the Knopfs make three new arguments in an effort to preserve their constructive fraudulent conveyance claim against MSF. These arguments were not raised in the December 2016 conference, and therefore, were not addressed in MSF's motion for summary judgment. Given the procedural posture of this case it would be entirely appropriate to ignore these eleventh hour arguments. But in the interest of finality, they will be briefly addressed. Through these three arguments the Knopfs assert that -- even if the $300,000 at issue is not disproportionate to the value of services rendered -- it is not fair consideration because MSF did not act in good faith.

The Knopfs first argue that MSF did not act in good faith because the 2015 Amendment did not require MSF to defend its clients against all efforts by the Knopfs to win a judgment, but

only required MSF to perform certain identified tasks.[9]  An
agreement to perform specified legal work in connection with
ongoing litigation does not mean that the services were not
offered in good faith.  The Knopfs, who carry the burden of
proving their claim have offered no authority to support the
proposition that a law firm in circumstances like those faced by
MSF may only recover legal fees if they make an open-ended
commitment to represent their client until the end of the
litigation and to forego all compensation if their client does
not prevail.

Second, the Knopfs assert that MSF did not receive the
Mortgage in good faith because (1) it knew at the time the
Mortgage was executed that Sanford had promised the Knopfs in
2006 not to encumber PHC, and (2) that the Mortgage would have
placed Sanford in breach of that commitment and would assist
Pursuit in placing assets beyond the reach of its judgment
creditors.  This argument also fails.  As described above, bad
faith does not exist merely because one creditor receives
payment knowing that the transferor is insolvent and the payment
could have gone to pay other creditors.  Moreover, the Knopfs
have presented no evidence of MSF's participation in any

---

[9]  This argument by the plaintiffs is in tension with their prior
assertion that the $300,000 represented a flat fee as opposed to
a fee for specific categories of work.

fraudulent activity associated with the 2006 loans.  MSF did not

even begin to represent Pursuit until 2012.  Finally, it bears

noting that as of the date the Mortgage was executed, litigation

concerning the original loan agreements had been ongoing in

state court for more than five years and no judgment had been

issued.  In fact, no judgment has been issued as of today, more

than two years after the Mortgage was given to MSF.  Moreover,

the Knopfs' requests to encumber PHC had been considered and

ultimately rejected by the state court -- twice.  The lis

pendens were removed on December 23, 2014, and after their

reinstatement, they were removed once again on July 2, 2015.

The Knopfs have cited no case in which bad faith has been found

in such circumstances.[10]

Finally, the Knopfs argue that the recording of the

Mortgage on January 21, 2015, after Justice Acosta's January 8,

2105 Order prohibiting any encumbering of PHC, constitutes MSF's

bad faith.  At the time the Mortgage was issued to MSF, no court

order prevented its issuance.  The Knopfs have not shown that

the subsequent recording of the Mortgage, which merely gives

public notice of the encumbrance, is an act taken in bad faith.

---

[10]  The plaintiffs' reliance on <u>Motorola, Inc. v. Abeckaser</u>, No.
07-CV-3963 (JG) (SMG), 2010 WL 415290, at *6 (E.D.N.Y. Jan. 29,
2010), is misplaced.  <u>Motorola</u> addressed the circumstances in
which a bona fide purchaser of real property may have the
conveyance set aside under Real Property Law § 266.  <u>Id</u>. at *6.

See <u>Fairmont Funding, Ltd. v. Stefansky</u>, 754 N.Y.S.2d 54, 56 (2d Dep't 2003); 92 N.Y. Jur.2d Records and Recording § 131 ("The general purpose of recording acts and recording is to give notice to the world that the title to property has been transferred, and thus prevent the fraudulent sale of the same property more than once to different purchasers. The recording of an instrument affecting property is constructive notice to all subsequent purchasers, lienors, and other interested parties of its existence and contents."). As MSF points out, Justice Acosta's order forbade "encumbering the subject property pending an expedited motion to a full panel of this Court . . . ." The act of encumbering PHC with the Mortgage took place before that order was issued. See <u>Dime Sav. Bank of New York, FSB v. Roberts</u>, 563 N.Y.S.2d 253, 255 (1990) ("[M]ortgages become liens when they are executed").[11] Since the plaintiffs have not presented evidence from which a fact finder could conclude that the Mortgage was given without fair consideration, summary judgment is granted.

---

[11] The Knopfs' reliance on <u>S.E.C. v. Haligiannis</u>, 608 F. Supp. 2d 444 (S.D.N.Y. 2009), is misplaced. There, the debtor made an "inside" sale of property to a relative, who did not act in good faith in recording a mortgage. <u>Id</u>. at 450, 452.

## CONCLUSION

MSF's January 13, 2017 motion for summary judgment is granted. The Clerk of Court is directed to enter judgment for MSF.

Dated:    New York, New York
          April 18, 2017

                              _____
                                    DENISE COTE
                          United States District Judge